**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LEE T. STAROPOLI, | |
| Plaintiff, | |
| v. | Civil Action No. 09-1766 (BAH) |
| | Judge Beryl A. Howell |
| PATRICK R. DONAHOE, Postmaster General of the United States, | |
| Defendant. | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff Lee T. Staropoli, a former Postal Inspector, brings this lawsuit against the

Defendant Postmaster General of the United States, under Title VII of the Civil Rights Act of

1964, 42 U.S.C. 2000e *et. seq*., alleging that she was subject to disparate treatment

discrimination on the basis of sex (Count I), disparate impact discrimination on the basis of sex

(Count II), and retaliation for engaging in protected activity (Count III).  Complaint ("Compl."),

ECF No. 1, at 9-14.  This Court earlier denied the Defendant's Motion to Dismiss, finding that

the plaintiff exhausted her administrative remedies.  Order (May 25, 2011), ECF No. 24;

Memorandum Opinion (May 25, 2011), ECF No. 23.  Pending before the Court is the

Defendant's Motion for Summary Judgment.  ECF No. 33.  The plaintiff opposes summary

judgment as to Counts I and III, Pl.'s Opp'n to Def.'s Mot. for Summ. J., ECF No. 39, at 1-2, but

agrees to a voluntary dismissal of Count II, *id.* at 2 n.1.  Accordingly, the Court grants the

Defendant's Motion for Summary Judgment as conceded by the plaintiff as to Count II, *id.*, and,

for the reasons explained below, grants the Defendant's Motion for Summary Judgment on the merits as to Counts I and III.[1]

## I.    BACKGROUND

### A.    Factual Background

#### 1.    Plaintiff's Employment in the Postal Service

The plaintiff was an employee of the United States Postal Service, beginning in 1987, until her termination in 2001.  Compl. ¶¶ 4, 41, Defendant's Answer ("Answer"), ECF No. 25, ¶¶ 4, 41.  The plaintiff entered the United States Postal Service as a letter carrier in the Boston, Massachusetts area, and was later promoted and became a Postal Inspector in Buffalo, New York.  Def.'s Statement of Material Facts of Which There is No Genuine Dispute in Supp. of

---

[1] The defendant also argues in his Reply in Support of his Motion for Summary Judgment that the plaintiff's Opposition "should be disregarded and Defendant's Motion for Summary Judgment . . . granted as conceded" because the plaintiff filed her Opposition one-day late.  *See* Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 42, at 1 n.1.  The Court issued an Order to Show Cause, on January 15, 2013, why the case should not indeed be dismissed as conceded.  Minute Order (Jan. 15, 2013).  The plaintiff, on January 22, 2013, responded to the Court's Order to Show Cause, stating that "excusable neglect caused her failure to meet the August 21, 2012 deadline to the file the Opposition."  Pl.'s Show Cause to Extend the Time to Oppose Def.'s Mot. for Summ. J. for One Day, ECF No. 43, at 1.   Specifically, the plaintiff explained that (1) organizing the record and voluminous exhibits, as well as preparing the Opposition, "caused unexpected delays;" and, in addition, (2) "[i]t also took more time than expected to upload the entire pleading, including exhibits, into the CM/ECF system," and that, "[a]s a result of these administrative errors, the filing was not posted on the CM/ECF system until 1:53 AM on August 22, 2012."  *Id*. at 1-2.  The plaintiff argues that "[a]llowing an additional day will benefit the administration of justice by allowing Plaintiff to submit an Opposition to Defendant's Motion for Summary Judgment, thereby providing the Court with information sufficient to reach a decision on the merits."  *Id*. at 2.  The plaintiff also filed an Ex Post Facto Motion to Extend the Time to Oppose Def.'s Mot. for Summ. J., ECF No. 44, on which the defendant took no position.  With no opposition from the defendant, the Court granted the motion, finding that the plaintiff had shown excusable neglect and that it is preferable to decide this case on the merits, and retroactively extended the deadline for the plaintiff's Opposition until January 22, 2013.  Minute Order (Jan. 22, 2013).  The Court notes, however, that on August 24, 2012, three days after the due date for her Opposition, the plaintiff also filed two separate attachments, including unsealed exhibits and sealed exhibits filed without notice or permission of the Court.  ECF No. 40 (unsealed), ECF No. 41 (sealed).  The plaintiff has provided no explanation of why those exhibits were filed late, nor a motion to extend the deadline for her Opposition until August 24, 2012.  Those exhibits are therefore untimely and will not be considered.  The untimely exhibits include, *inter alia*, medical records from after the plaintiff was terminated from employment; correspondence regarding the USPIS part-time program, as well as the FBI's part-time program; and articles, websites, and statements about family-friendly workplaces.  Even if the Court were to consider these untimely exhibits, they would not alter this Court's reasoning or judgment in this matter.

Mot. for Summ. J. ("Def.'s Facts"), ECF No. 33-2, ¶¶ 1, 3.[2]  In 1992, the plaintiff became a

Polygraph Examiner for the Postal Service's law enforcement agency, the U.S. Postal Inspection

Service ("USPIS"), and, after extensive training, worked as a Polygraph Examiner in Boston.  *Id.*

at ¶ 5.

In 1998, the plaintiff's husband, another U.S. government employee, was transferred to

the Washington, D.C. area for work.  *Id.* at ¶ 7.  The plaintiff then applied for, and received, a

position as a Polygraph Examiner in the Washington, D.C. area.  *Id*; *see also* Transcript of

Deposition of Lee Staropoli (Dec. 14, 2011), ECF No. 33-3 ("Staropoli Dep.") at 25:8-25.

In 1997, before the plaintiff's transfer to the Washington, D.C. area, USPIS implemented

a new pay schedule for all Postal Inspectors called "the law enforcement availability pay," or

"LEAP," whereby law enforcement officers, including polygraph examiners, receive a 25

percent pay increase for working fifty-hour weeks.  Compl. ¶ 9; Answer ¶ 9; Def.'s Facts. ¶ 8.

USPIS developed the LEAP program in response to a congressional mandate in 39 U.S.C. §

1003(c), enacted as part of the Omnibus Consolidated Appropriations Act of Fiscal Year 1997,

Pub. L. No. 104-208, 110 Stat. 3009, 380-81 (1996).  Def.'s Mem. in Supp. of Mot. for Summ. J.

("Def.'s Mem"), ECF No. 33-1, at 21-22 (quoting *Powell v. U.S. Postal Serv*., No. 99-3320,

2000 U.S. App. LEXIS 2090 (Fed. Cir. 2000) (per curiam)).  Specifically, section 1003(c)

required that "[c]ompensation and benefits for all Postal Inspectors . . . be maintained on a

standard of comparability to the compensation and benefits paid for comparable levels of work in

---

[2] The plaintiff filed a Statement of Material Facts in Genuine Dispute in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Facts"), ECF No. 39-2, but does not specifically dispute or discuss the defendant's proposed facts, other than offering a blanket statement that the plaintiff "reserves the right to challenge Defendant's contentions concerning its statement of undisputed facts in this case," Pl.'s Facts at 1.  Since "the [C]ourt may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion," LCvR 7(h)(1), and because the plaintiff does not specifically controvert any of the defendant's facts, the Court relies heavily on the Defendant's Statement of Material Facts.  The Court also relies on allegations contained in the Complaint and admitted in the Answer, and the papers and exhibits related to the pending motion.

the executive branch of the Government outside of the Postal Service." Pub. L. No. 104-208, 110 Stat. 3009, 380-81 (enacting 39 U.S.C. § 1003(c)). Pursuant to this statutory mandate, a Postal Service task force studied the "General Schedule" ("GS") pay system used in nearly every other federal law enforcement agency, and after concluding that a direct conversion to that pay system was impossible, designed and implemented regulations, including LEAP, to fulfill the congressional mandate. *See Powell*, 2000 U.S. App. LEXIS 2090 at *2-3. LEAP governed the plaintiff's salary during her entire Washington, D.C. area tenure with USPIS. *See* Compl. ¶¶ 9, 13; Answer ¶ 9; Def.'s Facts ¶¶ 10, 12.

Although she inquired about part-time employment possibilities at the time she accepted the transfer offer, Staropoli Dep. at 39:14-17, the plaintiff understood that her new position would require full-time, fifty-hour weeks pursuant to the LEAP program. *Id*. at 40:6-9.

While USPIS originally hired the plaintiff to conduct polygraph examinations only in Maryland, the District of Columbia, and Virginia, Def.'s Facts ¶ 11, Staropoli Dep. at 27:13-22, USPIS expanded her geographic responsibilities in 1998 to include North Carolina and South Carolina, following the illness and death of another USPIS polygraph examiner, Def.'s Facts ¶ 13; Staropoli Dep. at 33:2-19. In three years of covering these geographic areas, the plaintiff never requested a decrease in her travel. *Id*. at 36:16-18.

Indeed, after her transfer, the plaintiff successfully worked the required fifty-hour weeks for three years. *See id*. at 40:10-17. This means, as the defendant points out, that the plaintiff was able to sustain a 50 hour-a-week schedule after "1) the institution [in 1997] of LEAP pay and its 50 hour workweek requirement, 2) her selection for a position in Washington and subsequent relocation from Boston [in 1998]; 3) the birth of her first child [in 1997]; and 4) the expansion of her geographic region of responsibility to include North Carolina and South

4

Carolina [in 1998]."  Def.'s Reply in Supp. of Mot. for Summ. J. ("Def.'s Reply"), ECF No. 42, at 6.  At some point, however, the plaintiff states that the "50 hour work week became burdensome and untenable given Ms. Staropoli's family and childcare responsibilities and obligations."  Compl. ¶ 13; Def.'s Facts ¶ 12.  Notably, the plaintiff used more sick leave in 2000, her third year in the Washington, D.C. area than she had in prior years, Def.'s Facts ¶ 14; Staropoli Dep. at 40:15-17, and, in 2001, the plaintiff states that she was not able to work 50 hours a week because she "was emotionally, physically, mentally exhausted."  Staropoli Dep. at 40:18-23.  At that point, the plaintiff argues that she, on her own behalf, "made a passionate plea to officials in the Postal Inspection Service for part-time employment."  Pl.'s Mem. in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), ECF No. 39-1, at 4.

### 2.    Plaintiff's Advocacy for Part-Time Employment and More Family-Friendly Policies in USPIS

Following her transfer, the plaintiff advocated for certain changes in working conditions — notably, a part-time employment program for USPIS — and even co-authored, in 1999, a detailed, eighty-five page proposal for creating a more family-friendly culture in the agency. Compl. ¶ 14; Ans. ¶ 14; *see also* Lee T. Staropoli & Rose M. Papa, The Heart of the Matter: Creating a Family Friendly Work Culture in the Inspection Service ("The Heart of the Matter"), Nov. 29, 1999, ECF No. 33-4.[3]

The Heart of the Matter stated, *inter alia*, that "[p]ressures to meet the demands of family, work, continuing education, volunteer and charitable activities, spiritual pursuits, and recreation present some of the greatest challenges confronting the average American worker," and that "[t]he pressures facing the federal law enforcement community are even greater."

---

[3] Since The Heart of the Matter is not paginated, the Court refers to the document by the Bates-stamp number applied by the plaintiff when she produced the report during discovery.  *See* Def.'s Mem. at 5 n.1.

Cover Letter from Plaintiff and Rose M. Papa to Kenneth Weaver, Chief Postal Inspector (Nov. 29, 1999), in The Heart of the Matter at LTS 1521.  The document, based in part on written testimonials from women at USPIS,[4] went on to "propose[] policies of work and family life initiatives for possible implementation within the Postal Inspection Service" and explained "how the proposals advance the Inspection Service mission and embrace the USPS corporate goals and vision." *Id.*

The Chief Postal Inspector, Kenneth C. Weaver, considered The Heart of the Matter, as did USPIS' Executive Committee.  Compl. ¶¶ 15-16, Answer ¶¶ 15-16.  The Executive Committee apparently rejected the proposal in their May 16-17, 2000 meeting, and the Chief Postal Inspector, on August 9, 2000, notified the plaintiff that USPIS would not implement the recommendations in the Heart of the Matter.  Compl. ¶¶ 15-19; Answer ¶¶ 15-19.

Around the time that USPIS decided not to implement the proposals in The Heart of the Matter, and after the plaintiff had made clear that she was advocating for more family friendly policies at USPIS, the plaintiff requested and received a recommendation from her supervisor, Roy Geffen, the Inspector in Charge.  The letter was glowing, and apparently a heartfelt testament to the plaintiff's excellent work at USPIS.  *See* Letter of Recommendation from Roy Geffen, Inspector in Charge, U.S. Postal Inspection Service, regarding Lee T. Staropoli (Oct. 24, 2000), ECF No. 33-5 (noting, *inter alia*, that the plaintiff "has demonstrated a high skill level and excellent work ethic, and has become a top-notch examiner" and that her "ethics, integrity, commitment and loyalty are above reproach").

Although the Executive Committee had rejected The Heart of the Matter proposal, the plaintiff continued to advocate for workplace changes, and in particular for a part-time

---

[4] As the defendant indicates, the authors of the report asked no men to provide testimonials. *See* Staropoli Dep. at 67:9-15 (Q: Did any men complain about having to work 50 hours a week?  A: I don't know.  Q: Did you ask any men?  A: No.  Q: Why not?  A: I don't know.  I just didn't.").

employment program, as well as for part-time employment for herself.  On December 13, 2000,

for example, the plaintiff wrote a letter to the Chief Postal Inspector "requesting that the Agency

issue a decision concerning her recommendations and the Proposal."  Compl. ¶ 20, Answer ¶ 20.

On January 16, 2001, Chief Postal Inspector responded, "reiterating the Agency's position

rejecting the proposal."  Compl. ¶ 21; Answer ¶ 21.  Furthermore, although USPIS still did not

offer a part time employment program, the plaintiff, on February 26, 2001, sent a letter to Chief

Postal Inspector Kenneth Weaver, through her first-line supervisor James Wachuta, requesting

part-time employment in order to meet her family responsibilities.  Letter from Lee Staropoli,

U.S. Postal Inspection Service, to Kenneth Weaver, Chief Postal Inspector, U.S. Postal

Inspection Service (Feb. 26, 2001), ECF No. 39-8.

On February 9, 2001, the plaintiff also initiated an "individual and class complaint

alleging that [USPIS'] pay policy discriminated against female Postal Inspectors."  Compl. ¶ 22;

*see also* Answer ¶ 22; Pl.'s Opp'n at 17; 1st EEO Compl., ECF No. 39-7.  (This is not the EEO

proposal underlying the instant action.)  The Counsel/Inspector in Charge responded to that

Complaint internally, noting that "[t]he 'allegations' [made in the complaint] are not at all

supported by a factual basis upon which we could provide an intelligent response.  There's

absolutely no basis articulated for even considering at this point designation of class action

status."  E-mail from Lawrence Katz, Counsel/Inspector in Charge, U.S. Postal Inspection

Service, to Deborah L. Lewis, U.S. Postal Inspection Service (May 8, 2001 8:37 a.m.), ECF No.

39-7, at 11.  Although not formally responding to the Complaint, USPIS did offer to send a

member of its Executive Committee to meet with the plaintiff to discuss her concerns, and noted

that "Ms. Staropoli has been an advocate of part-time employment for postal inspectors."  *Id.*

In March, 2001, the plaintiff took two weeks of sick leave, providing medical documentation that the plaintiff had Chronic Fatigue Syndrome.  Pl.'s Opp'n at 18.[5]

In April, 2001, the plaintiff again requested part-time employment status by contacting Acting Deputy Chief Inspector Rowan.  Pl.'s Opp'n at 19.  On April 24, 2001, the plaintiff also informed the Assistant Inspector-in-Charge, James Wachuta, that she "could no longer work a 50-hour week due to the Agency's discriminatory pay policy and [the] Agency's failure to implement the Proposal to allow a part-time program schedule to assist women with family and childcare responsibilities."  Compl. ¶ 24; *see also* Answer ¶ 24.

On May 1, 2001, the plaintiff again requested part-time employment or an unpaid leave of absence from the Chief Postal Inspector, Kenneth Weaver.  Compl. ¶ 25; Answer ¶ 25; Def.'s Facts ¶ 21.  On that same date, she also requested a leave of absence from her second-line supervisor, Geffen, "because the Agency had not granted her part-time employment request."  Compl. ¶ 26; Answer ¶ 26.[6]

The plaintiff's second-line supervisor, Geffen, denied both her request for part-time employment and her request for a leave of absence.  Compl. ¶ 27; Answer ¶ 27; Letter from Roy W. Geffen to Plaintiff (May 7, 2001), ECF No. 33-7.  He explained that "[t]here is still no part-time agent program in the Postal Service" and that the plaintiff "occup[ies] a unique position within the Inspection Service" and that USPIS' "operational needs" require full staffing "in strategic locations," including "in this locale."  Letter from Roy W. Geffen to Plaintiff at 1.

---

[5] The record is not clear how much time the plaintiff actually was at work, if at all, following her sick leave in March 2001 and her medical leave on May 1, 2001.

[6] The plaintiff also states that she spoke with Geffen by telephone at this time and that he "cruelly stated" to her, "I will not help you."  Pl.'s Opp'n at 19.  The plaintiff "interpreted this remark as an indication that [USPIS] was not willing to assist her under any circumstances and that she was a target because she co-authored The Heart of the Matter and filed the February 2001 EEO complaint."  *Id.*

While denying the plaintiff's request for part-time employment on the grounds that no part-time program existed, Geffen mentioned to the plaintiff other possible options, including 30 days of annual leave, or long-term leave for a serious health condition under the Family and Medical Leave Act.  *See id.*

Subsequently, Geffen granted the plaintiff leave from May 1, 2001 to July 16, 2001 after she provided medical documentation that she was not able to work but could return to work on July 16, 2001.  *See* Def.'s Facts ¶ 21; Letter from Plaintiff to Chief Inspector Weaver (July 13, 2001), ECF No. 33-6, at 1; Letter from Roy W. Geffen to Plaintiff (July 20, 2001), ECF No. 33-8; Pl.'s Opp'n at 20.

### 3. Plaintiff's Failure to Return to Work Despite Being Medically Cleared To Return to Work

The plaintiff accepted Geffen's offer of leave but, on July 16, 2001, the day she was medically cleared to return to work, the plaintiff did not report back to work.  *See* Letter from Roy W. Geffen to Plaintiff (July 20, 2001), ECF No. 33-8 (noting that he had only approved leave through July 13, 2001, that the plaintiff's health care provider had indicated a return date of July 16, 2001, and that "[a]s of this date, [the plaintiff had] not reported for duty nor . . . provided medical documentation stating [her] incapacity to perform the duties of [her] position").  Since the plaintiff did not return to work, Geffen placed the plaintiff on Absent Without Leave ("AWOL") status, effective July 16, 2001, and stated that the plaintiff was "directed to report for duty immediately."  *Id.*

Despite her supervisor's clear orders to return to work, the plaintiff *never* returned to work, nor did she submit any medical documentation to establish that she was incapable of returning to work.  *See* Staropoli Dep. at 80:2-4; Memorandum to File from Roy W. Geffen, Inspector in Charge, U.S. Postal Inspection Service, RE: Lee Staropoli (July 26, 2001), ECF No.

9

33-9 (noting that he had spoken with the plaintiff and that she had stated that "under my present condition, I [cannot] return to a 50 hour work week" and noting that he had not received "any current medical documentation" to this effect); Memorandum to File from Roy W. Geffen, Inspector in Charge, U.S. Postal Inspection Service, RE: Lee Staropoli (Aug. 20, 2001), ECF No. 33-10. Evidently, the plaintiff was going through a very difficult time personally and wrote to the Chief Inspector that "in all likelihood, it will just be a matter of time before I, again, become exhausted physically, emotionally, psychologically, and spiritually." Letter from Plaintiff to Chief Inspector Weaver (July 13, 2001), ECF No. 33-6, at 1; *see also* Pl.'s Opp'n at 20 (arguing that, although she had leave from May 1, 2001 to July 16, 2001, "the accommodation she was given simply was not sufficient for her to recover adequately," and that "[n]ot only did she need additional time away from work to recover, [she] also would not have been able to fully function at work on a full-time, 50 hour per week schedule"). The plaintiff notes that while the defendant "misconstrues" the July 13, 2001 letter as a "refusal to return to work," "nothing could be further from the truth." Pl.'s Opp'n at 21. Instead, the plaintiff argues that in that letter she made "an impassioned plea for assistance to continue working and to balance her family and medical needs." *Id*. In the July 13, 2011 letter, however, while the plaintiff requested part-time employment or additional time away from work, the plaintiff clearly acknowledged that she was "medically cleared to return to work," Letter from Plaintiff to Chief Inspector Weaver (July 13, 2001), ECF No. 33-6, at 1, and offered no indication that she was seeking medical documentation of any continuing medical problems that would prevent her from sustaining employment with USPIS.

The plaintiff also apparently did not pursue alternative employment arrangements that would have allowed for her to work fewer hours. For example, while the plaintiff continued to

request part-time employment, she declined Geffen's offer to opt out of the LEAP program temporarily to work a 40-hour week because she did not, at the time, think she could work 40 hours a week.  *See* Memorandum to File from Roy W. Geffen RE: Lee Staropoli (July 26, 2001), ECF No. 33-9; Staropoli Dep. at 90:2-7.  Furthermore, while the plaintiff continued to request part-time employment despite the fact that her position as a Postal Inspector was not eligible for part-time employment at the time, *see* Memorandum to File from Roy W. Geffen RE: Lee Staropoli (Aug. 20, 2001), ECF No. 33-10, the plaintiff did not apply for any non-inspector part-time positions that would have qualified her for part-time employment.  *See* Staropoli Dep. at 99:3-8 ("Q: Did you apply for a headquarters part-time position?  A: I asked them for part-time. Q: Did you apply for a position at headquarters that would have placed you on part-time status? A: No.").

4.    **Plaintiff is Placed on AWOL Status and Subsequently Removed from Federal Service**

After the plaintiff ignored Geffen's direct order to return to work, and after Geffen placed the plaintiff on AWOL, Geffen proposed that USPIS terminate the plaintiff's employment.  *See* Letter from Roy W. Geffen, Inspector in Charge, U.S. Postal Inspection Service, to Lee Staropoli, U.S. Postal Inspection Service, RE: Notice of Proposed Adverse Action - Removal (Aug. 28, 2001), ECF No. 33-11.

Shortly after Geffen proposed the plaintiff's removal, USPIS announced, in September 2001, that it would begin a part-time employment program in January of 2002.  *See* Letter from Lee T. Staropoli, U.S. Postal Inspection Service, to Kenneth Newman, Deputy Chief Inspector, U.S. Postal Inspection Service, and Roy Geffen, Inspector in Charge, U.S. Postal Inspection Service (Sept. 17, 2001), ECF No. 39-11.  The plaintiff requested leave without pay until she

could be assigned to the new part-time program when it commenced in slightly less than three

months, *id*. at 1, but that request was not granted.

Instead, on November 27, 2001, the Deputy Chief Inspector, Kenneth Newman, after

reviewing the plaintiff's response to the proposal to remove her from employment, informed the

plaintiff by letter that the charge of AWOL was "sustained and warrants [her] removal from the

Postal Service," effective December 3, 2001.  Letter of Decision – Adverse Action (Removal)

from Kenneth Newman to Plaintiff (Nov. 27, 2001) ("Removal Letter"), ECF No. 33-12 at 4.  By

this time, the plaintiff had been away from her job for at least seven months.

### B.    Procedural History

Almost three years after the effective date of her termination, and over four years after

she had last reported for work, the plaintiff filed an administrative complaint against the Postal

Service with the Equal Employment Opportunity Commission ("EEOC") on October 17, 2005.

*See* Memorandum Opinion, ECF No. 23, at 3.  On June 26, 2007, an EEOC Administrative Law

Judge ("ALJ") held a hearing, and issued a bench decision dismissing the case on the merits the

same day.  *See id*.; Hearing Transcript & ALJ Decision (June 26, 2007), ECF No. 11-5, at 27

(finding that the plaintiff "has not shown that the agency's reason for its action is a pretext for

gender discrimination or reprisal, or that the real reason for its action is gender discrimination or

retaliation").   Staropoli appealed the ALJ's decision to the EEOC's Office of Federal Operations

("OFO") on August 4, 2008, and OFO dismissed the appeal as untimely by a ruling issued on

December 3, 2008.  *See* Memorandum Opinion, ECF No. 23, at 3.  On December 22, 2008,

Staropoli moved for reconsideration of the denial of her appeal, and the OFO again denied the

appeal on reconsideration on June 19, 2009.  *See id*. at 3.

12

The plaintiff filed her Complaint in this Court on September 17, 2009.[7]  ECF No. 1.  The

defendant then filed a motion to dismiss or, in the alternative, for summary judgment, arguing

that the plaintiff had not exhausted her administrative remedies.  Def.'s Mem. in Supp. of Def.'s

Mot. to Dismiss, Or In the Alternative, for Summ. J., ECF No. 11, at 4.  The Court found that the

plaintiff had exhausted her administrative remedies, and denied the defendant's motion to

dismiss.  Order (May 25, 2011), ECF No. 24; Memorandum Opinion (May 25, 2011), ECF No.

23.

Following the denial of the defendant's motion to dismiss, the Court's initial scheduling

order required the parties to complete discovery by December 20, 2011, *see* Scheduling Order of

July 7, 2011; the Court extended these deadlines by consent of the parties through January 20,

2012, *see* Minute Order (Dec. 20, 2011).

The defendant has now filed a Motion for Summary Judgment, ECF No. 33, which is

pending before the Court.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is properly

granted against a party who, "after adequate time for discovery and upon motion, . . . fails to

make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).  The burden is on the moving party to demonstrate that there is an "absence of a

genuine issue of material fact" in dispute.  *Id*. at 323.

---

[7] This case was reassigned to the under-signed Judge on January 20, 2011.  *See* Minute Order (Jan. 20, 2011).

In ruling on a motion for summary judgment, the Court must draw all justifiable inferences in favor of the nonmoving party, and shall accept the nonmoving party's evidence as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." FED. R. CIV. P. 56(c)(3). For a factual dispute to be "genuine," *Estate of Parsons*, 651 F.3d at 123, the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence" in support of its position, *Anderson*, 477 U.S. at 252, and cannot simply rely on allegations or conclusory statements, *see Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *See Anderson*, 477 U.S. at 250. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

## III.   DISCUSSION

The plaintiff alleges in her Complaint that she was subject to disparate treatment discrimination on the basis of sex (Count I), disparate impact discrimination on the basis of sex (Count II), and retaliation for engaging in protected activity (Count III). *See* Compl. at 9-14. The defendant moves for summary judgment on all three counts, arguing, *inter alia*, that her disparate impact claim fails as a matter of law because the "[p]laintiff's willful failure to provide any statistical information or expert reports prevents her from establishing a *prima facie* case of disparate impact discrimination," and that her disparate treatment and retaliation claims fail because, "[c]ontrary to Plaintiff's allegations, she was not removed from her position due to her gender or in retaliation for prior conduct, but rather because Plaintiff refused to come to work, as

14

Plaintiff herself admitted at her deposition under oath." Def.'s Mem. at 1, 15; Def.'s Reply at 11

(arguing that the "undisputed reason that USPIS removed Plaintiff from the federal service was

because she chose not to report to work," and that "[t]his legitimate, non-discriminatory, and

non-retaliatory reason for the Agency's action entitles it to judgment as a matter of law"). As

noted, the plaintiff opposes summary judgment as to Counts I and III, Pl.'s Opp'n at 1-2, but

agrees to a voluntary dismissal of Count II, *id.* at n.1. Since the plaintiff has conceded that the

defendant is entitled to summary judgment as to Count II, the Court will proceed by addressing

the plaintiff's only remaining claims, in Counts I and III, *seriatim* below.

### A.    Disparate Treatment Claim

The Court first turns to the plaintiff's claim that she was subject to disparate treatment

due to the defendant's discrimination against her on the basis of her sex in violation of Title VII.

Compl. at 9-11. The plaintiff alleges in her Complaint that the defendant discriminated against

her on the basis of her sex by: (1) "denying her request for part-time employment to assist with

her family and childcare responsibilities;" (2) "denying her request to participate in a Part-Time

Inspector Program that would have assisted with her family and childcare responsibilities;" and

(3) "removing her from federal service on November 27, 2001, effective December 3, 2001,"

Compl. ¶¶ 50-52. The first two allegations about USPIS' denial of her requests for part-time

employment are the same allegations underlying her conceded Count II disparate impact claim.

In the context of Count I, the plaintiff must show that, by contrast to how men were treated by

USPIS, she was denied part-time employment on the basis of her sex. In other words, despite the

plaintiff's efforts to shoehorn into the case arguments about disparate impact, this case does *not*

present a question of whether USPIS should have offered a part-time program to postal

inspectors, or offered this program earlier than it did. Instead, as the plaintiff appears to

recognize, the issue here is only whether the plaintiff was terminated due to sex discrimination. *See, e.g.*, Pl.'s Opp'n at 1 ("As set forth herein, there are material and disputed facts from which a reasonable jury could conclude that Defendant . . . discriminated against Ms. Staropoli on the basis of her sex (female) (Count I) . . . by terminating her prior to the implementation of the Agency's Part-Time Inspector Program, which would have given her the leave she needed to continue her employment as a Postal Inspector and to meet her family and childcare obligations."); *see id.* ("If allowed to proceed to a jury, Ms. Staropoli will be able to show that her termination by the Postal Service violated Title VII"); *id.* at 36 ("The issue, then, is whether [USPIS] discriminated against Ms. Staropoli because of her sex when it terminated her employment.").  The Court, as explained below, finds that the plaintiff was not terminated due to sex discrimination.

In a case where there is no direct evidence of discrimination, the Court is guided in its analysis of circumstantial evidence by the familiar burden-shifting framework established in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-804 (1973).  Pursuant to the *McDonnell-Douglas* framework, it is the plaintiff's burden first to establish a *prima facie* case of sex discrimination by showing that "(1) . . . she is a member of a protected class; (2) . . . she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Nguyen v. Mabus*, No. 09-1349, 2012 U.S. Dist. LEXIS 141036, *23-25 (D.D.C. Sept. 30, 2012).  If the plaintiff succeeds in establishing a *prima facie* case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions.  *McDonnell-Douglas*, 411 U.S. at 802.  If the defendant establishes a legitimate, nondiscriminatory reason, "the burdenshifting framework disappears, and a court reviewing

summary judgment looks to whether a reasonable jury could infer intentional discrimination . . .

from all the evidence." *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

Courts "need not – *and should not* – decide whether the plaintiff actually made out a

*prima facie* case under *McDonnell Douglas*," however, where (1) "an employee has suffered an

adverse employment action," and (2) "an employer has asserted a legitimate, non-discriminatory

reason for the decision." *Brady v. Office of the Sergeant at Arms, U.S. House of Reps.*, 520 F.3d

490, 494 (D.C. Cir. 2008) (emphasis in original).  In this case, the plaintiff suffered an adverse

employment action when she was terminated from USPIS, and the defendant has asserted a

legitimate, non-discriminatory reason for the decision, namely that she "refused to come to work,

as Plaintiff herself admitted at her deposition under oath."  Def.'s Mem. at 1; *see id*. at 15 (noting

that "the undisputed reason that USPIS removed Plaintiff from the federal service was because

she chose not to report to work").

Thus, in this case, the Court need not decide whether the plaintiff made out a *prima facie*

case, but, instead, "the district court must resolve one central question," namely "[h]as the

employee produced sufficient evidence for a reasonable jury to find that the employer's asserted

non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of [sex]?"  *Brady*, 520 F.3d at 494.  "[T]he

Court's task here is to determine whether [the plaintiff] has produced sufficient evidence for a

reasonable jury to find that Defendant's asserted reasons . . . were mere pretexts for illegal

[discrimination]."  *Alford v. Def. Intelligence Agency*, No. 10-631, 2012 U.S. Dist. LEXIS

175594, at *14 (D.D.C. Dec. 12, 2012).  "[S]ufficient evidence may include, *inter alia*, (1) the

plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's

proffered explanations for its actions; and (3) any further evidence of discrimination that may be

available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)."  *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (citations and internal quotation marks omitted).

Here, the plaintiff has not produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason" for her termination and that "the employer intentionally discriminated against the employee on the basis of [sex]." *Brady*, 520 F.3d at 494.  Rather, the record is clear that the plaintiff was terminated because she was AWOL from work, with no medical explanation for her absence, and that, furthermore, her employer made earnest efforts to get her to come back to work before they terminated her.  *See* Letter from Roy Geffen, Inspector in Charge, to Plaintiff (July 20, 2001), ECF No. 33-8 (notifying the plaintiff that she was being placed on AWOL status effective July 16, 2001 because her health care provider had "indicated a return to duty date of July 16, 2001"); *see id*. ("As of this date, you have not reported for duty nor have you provided medical documentation stating your incapacity to perform the duties of your position."); Memo to File from Roy W. Geffen, Inspector in Charge, Regarding Lee Staropoli (July 26, 2001), ECF No. 33-9 (noting that he had informed the plaintiff by phone that "due to the fact that she has not provided any medical documentation for me to review, she has not requested a 40 hour (without LEAP) temporary assignment, so she needs to come back to work immediately"); *see id*. (noting that the plaintiff acknowledged on the telephone that "I understand you are ordering me back to work," and "I am telling you I can not and will not be returning to work at this time"); *see id*. (noting that Geffen told the plaintiff "I have no choice but to write her a letter of removal," and that the plaintiff stated "I have to do what I have to do"); Memo to File from Roy W. Geffen, Inspector in Charge, RE: Lee Staropoli (Aug. 20, 2001), ECF No. 33-10 (noting that Geffen called the plaintiff

because he "was hoping she had changed her mind" and reported to work that morning, and that

plaintiff responded "Roy, I told you Friday I was not going to be there"); Letter from Roy

Geffen, Inspector in Charge, to Plaintiff Regarding Notice of Proposed Adverse Action –

Removal, ECF No. 33-11 (providing the plaintiff notice of a proposal to remove her from

employment based on the plaintiff's AWOL status); *see id.* at 3 (explaining that Geffen had "no

choice but to take this action" because the plaintiff "refused to return to [her] assignment and . . .

made it clear that [she had] no intention of doing so"); *see id.* (stating that plaintiff "could and

should have returned to duty and followed established protocols to seek a solution to [her]

personal situation"); Letter of Decision Regarding Adverse Action (Removal) from K.W.

Newman, Deputy Chief Inspector, to the Plaintiff (Nov. 27, 2001), ECF No. 33-12, at 4

(informing the plaintiff of the "decision that the charge of [AWOL] contained in the Notice of

Proposed Removal[ ] is sustained and warrants your removal from the Postal Service," effective

December 3, 2001); *see id.* at 1 (noting in extensive discussion of the plaintiff's refusal to report

for work that the medical documentation submitted by the plaintiff "pronounced [her] fit for duty

as of [July 16, 2001] and thus [her] refusal to report for duty is not based on any medical

incapacity you have made known to the Inspection Service"); *see id.* (noting that "it is clear to

me great effort has been made by Inspection Service management to accommodate your personal

situation and to facilitate your return to duty," for example through granting the plaintiff

extended periods of leave without pay and approving many requests for annual leave).

 As the defendant notes, the plaintiff herself admitted in her deposition that her

unauthorized absence from work was the reason for her termination.

> Q       Okay.  My question is:  At this time, on July 26, 2001, you understood that
>         you were being ordered back to work; is that correct?
> A       Yes.
> Q       Okay.  And you stated at that time that you would not return to work; is

|   | that correct? |
|---|---|
| A | Yes. |
| Q | And therefore, you would be placed on AWOL; is that correct? |
| A | Yes. |
| Q | And were you placed on AWOL? |
| A | Yes. |
| Q | And was that the cause of your removal? |
| A | Yes. |
| Q | Okay. |

Staropoli Dep. at 86:10-24.  The plaintiff attempted to clarify in her deposition that the "cause of [her] removal was the agency's unwillingness to give me any leave, and to not place me on AWOL status" and "they had choices to make."  *Id*. at 86:25 to 87:1-2.  The plaintiff characterizes the defendant's argument that the plaintiff was terminated because she did not return to work as "simplistic and deceptively convincing at first blush."  Pl.'s Opp'n at 2.  Yet, the record is, in fact, crystal clear that the plaintiff was terminated due to her being AWOL without a medical excuse, that the plaintiff was aware of this basis for her termination, and, furthermore, that the plaintiff had opportunities to rectify the situation but did not do so by, for example, providing a medical excuse for her absence or reporting to work.  Hence, the defendant is correct that the plaintiff "admits (as she must) the one basic, undisputed fact that defeats her claims in this case: Plaintiff failed to report to work as ordered, was thus considered Absent Without Leave ('AWOL'), and, therefore, Plaintiff lost her job."  Def.'s Reply at 2 (citation omitted).

In addition to this admission about the reason for her termination, the plaintiff notably fails to overcome the strong inference that Geffen, the supervisor who approved her hire in the Washington, D.C. area and later proposed her removal, did not intentionally discriminate against her.  *See, e.g., Vatel v. Alliance of Auto Mfrs*., 627 F.3d 1245, 1247 (D.C. Cir. 2011) (noting that "when the person who made the decision to fire was the same person who made the decision to

hire, it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire," especially in a situation "when the firing has occurred only a short time after the hiring") (alteration in original) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 996 (D.C. Cir. 2002)); *see also Mianulli v. Potter*, 634 F. Supp. 2d 90, 97 (D.D.C. 2009) (concluding, in a situation where the same person who hired the plaintiff proposed his removal, that "USPS is therefore entitled to the inference that [the plaintiff's] supervisor would not have hired him just to turn around and immediately terminate him for an unlawful reason"); *Valles-Hall v. Ctr. for Nonprofit Advm't*, 481 F. Supp. 2d 118, 151 (D.D.C. 2007) (same).   As the defendant indicates, the plaintiff's Opposition "does not even attempt to rebut" this inference to which USPIS is entitled here.   Def.'s Reply at 13.

Moreover, Geffen not only arranged for the plaintiff's hire in the Washington, D.C. area, but gave her more responsibility as a Polygraph Examiner, with an expanded geographic territory, granted her medical leave, and, at the plaintiff's request, wrote the plaintiff a glowing letter of recommendation months before she was removed from service.   Geffen's demonstration of his appreciation of the plaintiff's work and character only further reinforces that Geffen's proposed removal of the plaintiff was not based on sex discrimination.   *See, e.g., Brooks v. Clinton*, 841 F. Supp. 2d 287, 302 (D.D.C. 2012) (noting that "discrimination here would be particularly surprising since [the plaintiff's supervisor] himself previously lauded the plaintiff's work in earlier years, describing her prior work as 'outstanding' and recognizing her prior contributions with performance awards").   Thus, from the record, there is simply no indication that Geffen had any discriminatory animus for the plaintiff, but, instead, Geffen appears to have been interested in supporting the plaintiff's USPIS career.   The record also shows that the plaintiff was terminated only after Geffen ordered the plaintiff to return to work, informed her

that she would be terminated if she did not return to work, and even followed up with her

"hoping she had changed her mind" about returning to work.  Memo to File from Roy W.

Geffen, Inspector in Charge, RE: Lee Staropoli (Aug. 20, 2001), ECF No. 33-10.

   The plaintiff argues that her termination "was not a foregone conclusion and the Agency

could have easily accommodated" the plaintiff, Pl.'s Opp'n at 5, but that is unsupported

speculation.  USPIS had no part-time program at the time for ISLE (Inspection Service Law

Enforcement) employees in the plaintiff's position, which is exactly why the plaintiff was

advocating for the creation of one.  *See id*. at 16 (explaining that the plaintiff wrote a letter to

Chief Postal Inspector Weaver advocating that Inspection Service employees like herself be

allowed to "take advantage" of the part-time program for EAS employees).  Furthermore, it is

also apparent from the record that USPIS attempted to work with the plaintiff in developing

some possible alternatives to working 50-hour weeks and finding ways for her to take a longer

period of leave if medically necessary.  For example, Geffen discussed with the plaintiff the

possibility of opting out of the LEAP program temporarily and working 40-hours a week, but the

plaintiff dismissed this idea.  *See* Geffen Memo to File RE: Lee Staropoli (July 26, 2001), ECF

No. 33-9.  He also inquired repeatedly as to whether she had medical documentation for not

returning to work.  *See id*; *see also* Geffen Letter to Plaintiff (May 7, 2001), ECF No. 33-7, at 2

(informing her that "if [her] absence is due to a serious health condition as defined under the

Family and Medical Leave Act (FMLA), [she] may be entitled to certain protections under the

Act").  Thus, the defendant attempted to provide, or at least suggest, some alternatives for the

plaintiff but plaintiff apparently did not pursue these possibilities, nor did she apply for other

positions in the agency where part-time employment may have been a possibility, *see* Pl.'s

Opp'n at 22.  Instead, the plaintiff simply continued to request a part-time position as a Postal

Inspector with USPIS (a position that did not exist) and refused to come back to work.[8]  While

the plaintiff indicates that she "did not intend to be insubordinate when she did not return to

work," *id*. at 24, she was, and USPIS' decision to terminate her on that basis has not been shown

to be discriminatory in any way.

Although the plaintiff admitted in her deposition that her AWOL status was the reason

for her termination, she still attempts to suggest that the AWOL charge was a mere pretext for a

discriminatory termination on the basis of sex by presenting evidence to challenge the

defendant's proffered reason for her termination, as well as other evidence to suggest that USPIS

generally discriminates against women through its un-family friendly policies.  The Court

addresses the plaintiff's arguments in turn.

First, the plaintiff's Opposition is replete with arguments attempting to connect the

plaintiff's allegedly discriminatory termination with her concerns about the disparate impact of

USPIS' policies on female employees.  As noted, the plaintiff has conceded her disparate impact

claim, *see* Pl.'s Opp'n at 1-2 n.1, so the Court will thus not address the merits of the plaintiff's

claims regarding the LEAP Policy's alleged disparate impact on female Postal Inspectors.

Although the plaintiff concedes the disparate impact claim, her Opposition nevertheless raises

issues about the LEAP program's undue burden on female Postal Inspectors, *see* Compl. ¶¶ 11-

14, and includes arguments only relevant to the conceded disparate impact claim.  *See, e.g.*, Pl.'s

Opp'n at 2 (noting that, at the time of the plaintiff's termination, USPIS was aware that LEAP

"was placing an undue burden on female employees with family and child care obligations

because the schedule required Postal Inspectors to work a mandatory 50 hours a week"); *id*. at 3

---

[8] The plaintiff discusses her medical conditions at length in the Opposition, and attaches confidential exhibits related
to her health, but the plaintiff nowhere disputes that she was "medically cleared" to return to work as of July 16,
2011, and nowhere explains why she did not respond to her supervisor's numerous requests for any medical
documentation that she was not able to return to work.

("By rejecting Ms. Staropoli's [Heart of the Matter] proposal, the Postal Inspection Service sent a clear and unmistakable message that condoned discrimination against women."); *id.* (noting that the plaintiff's health began deteriorating while she was on the phone with another pregnant Postal Inspector "who was concerned about the hostile work environment females faced in the Postal Inspection Service" and that her health continued to decline after that); *id.* at 5 (arguing that "Female Postal Inspectors were disproportionately impacted by the LEAP schedule and had more prevalent problems managing a balance between career, personal and family obligations" and the fact that USPIS "discarded [the plaintiff's] career and failed to provide the support necessary to keep her from becoming another statistic demonstrates a bias and an inference of discrimination sufficient for a jury to find" for the plaintiff); *id.* at 21 (noting that USPIS "alone had the choice to extend an accommodation to retain a highly praised and valued Postal Inspector . . . or to continue its practice of discriminating against women by failing to implement measures that recognized the unique support systems necessary for women in law enforcement to effectively balance work and family demands"); *id.* at 28-32 (reviewing the resignation letters of multiple former female Postal Inspectors who quit due to USPIS' policies); *id.* at 31 (noting that although the defendant would argue that the plaintiff "deliberately chose to resign her position because she supposedly refused to return to work," she could have continued to work if given proper accommodations that allowed her to "handle[] both her personal and family obligations, as well as her duties as a Postal Inspector, if [USPIS] had accommodated her.").  These allegations are simply not relevant to the plaintiff's disparate treatment claim.  To the extent that the plaintiff's factual allegations show that USPIS was aware that its policies were not family friendly and were especially hard on women, these factual allegations are relevant only to the plaintiff's conceded disparate impact claim.  These allegations in no way support an inference

that the defendant intentionally discriminated against the plaintiff on the basis of her sex in terminating her employment, and do not provide sufficient evidence that the defendant's stated reason for the plaintiff's termination was pretextual.

Second, the plaintiff suggests that the proffered reason for her termination was pretextual because USPIS "failed to utilize all the measures in its arsenal and simply fired Ms. Staropoli weeks before the implementation of the Postal Inspector Part-Time Pilot Program." *Id.* at 44; *id.* at 27 (noting that "[g]iven all the options and choices that [USPIS] had at its disposal, the termination of [the plaintiff] did not have to occur and one is left with the strong inference that [USPIS'] failure to assist [the plaintiff] was discriminatory"). The "cause of [her] removal" was not "the agency's unwillingness to give [her] any leave," as the plaintiff contends, however. Pl.'s Opp'n at 27 (quoting Staropoli Dep. at 86-87). It was her decision not to return to work when ordered to do so.

Furthermore, any suggestion that USPIS' decision to implement a part-time program after the proposed removal of the plaintiff means that the defendant's reason for the plaintiff's termination was pretextual is unavailing. As the defendant suggests, the temporal proximity of the implementation of the part-time program and the termination of the plaintiff's employment may merely be coincidental. *See* Def.'s Mem. at 20. More significantly, the plaintiff has not shown any evidence to suggest that the timing of the part-time program's implementation was in any way connected to the plaintiff's removal proceedings. Indeed, the plaintiff would have presumably been eligible to apply for the new Part-Time Pilot Program if she had qualified for and taken FMLA leave, produced medical reports for USPIS that convinced them to give her a longer medical leave, or accepted her supervisor's proposal that she temporarily work 40 hours a

week.  Thus, in no way does USPIS' introduction of this program suggest that the agency's decision to terminate the plaintiff was pretextual.

Third, the plaintiff compares the treatment she received when requesting part-time employment and additional leave to the treatment given to other USPIS employees and contends that, because these other employees were granted leave, she was also entitled to leave.  In support of this contention, she provides the declaration of a former supervisor regarding the treatment by USPIS of two male postal inspectors, one of whom suffered a massive, debilitating heart attack, which left him confined to a wheelchair, and the other who had a brain tumor.  *See* Declaration of John Griffith, ECF No. 39-14 ("Griffith Decl.").  The plaintiff argues that, like these other Postal Inspectors, she should have been granted leave.  *See* Pl.'s Opp'n at 16 (noting that "[w]hile this ad hoc, fly by the seat of your pants approach to [allowing employees' leave] worked well for employees like Mr. Thomas [who had the massive, debilitating heart attack], the highly subjective nature of the decision-making left other employees, such as Ms. Staropoli, without any clear options.").  This argument is spurious, however.  These two male employees the plaintiff uses for comparison in treatment had serious, debilitating and life-threatening medical conditions whereas the plaintiff was "medically cleared" to return to work, *see* Pl.'s Letter to Weaver (July 13, 2001), ECF No. 33-6, at 1, and failed to provide a medical excuse for her absence from work after July 16, 2001, when she effectively granted herself leave and decided not to return to work.  The plaintiff also acknowledged in her deposition that, in July 2001, she apparently did not request sick leave by filling out a form for her supervisor's approval, nor Family Health and Medical Leave Act leave.  *See* Staropoli Dep. at 95:19-25, 96: 1-10; 97:24-45 – 98:1-3.  While the Court makes no assessment whether the Plaintiff warranted a medical leave of some kind, the record indicates, and the Plaintiff concurs, that she was

"medically cleared" to return to work as of July 16, 2001, *see* Pl.'s Letter to Weaver (July 13,

2001), ECF No. 33-6, at 1, and failed to return on that day or any day thereafter.  Her situation is

patently distinguishable from the situations of her two colleagues who had a massive, debilitating

heart attack and a brain tumor, and, as the plaintiff acknowledges at least as to Henry Thomas,

"needed assistance during a tragic period."  Pl.'s Opp'n at 23.  Accordingly, the plaintiff has not

provided sufficient evidence to show that the defendant's asserted reason for her termination was

a mere pretext for her discrimination.

Since the plaintiff has not offered evidence sufficient to refute USPIS' legitimate, non-

discriminatory reason for her termination, no reasonable jury could find that USPIS terminated

the plaintiff because of sex discrimination.  *See Brady*, 520 F.3d at 494.  The Court will therefore

grant summary judgment for the defendant on the plaintiff's disparate treatment claim.

### B. Retaliation Claim

The Court now turns to the plaintiff's claim that she was subject to retaliation.

Specifically, the plaintiff argues that her termination from USPIS was in retaliation for protected

activity in the form of (1) "opposing the Agency's discriminatory LEAP pay program," (2) the

Agency's refusal "to implement her Proposal or a part-time program," and (3) the plaintiff's

initiation of "EEO/EEOC complaints against the Agency related to the fact that the Agency's pay

policy had a disparate impact on female Postal Inspectors."  Compl. ¶ 64.  In its Motion for

Summary Judgment, the defendant again argues that the only reason for the plaintiff's

termination is "the undisputed reason that . . . she chose not to report to work."  Def.'s Mem. at

15; *see id*. at 19 (positing that "Plaintiff's choice to not report as ordered is the legitimate, non-

retaliatory reason for her removal and Defendant is therefore entitled to judgment as a matter of

law on Plaintiff's retaliation claim").  The Court agrees.

"To prove unlawful retaliation, a plaintiff must show: (1) that [s]he opposed a practice made unlawful by Title VII; (2) that the employer took a materially adverse action against [her]; and (3) that the employer took the action 'because' the employee opposed the practice." *McGrath v. Clinton*, 666 F.3d 1377, 1380 (D.C. Cir. 2012). The *McDonnell-Douglas* and *Brady* frameworks that apply to the Court's analysis of the disparate treatment claim when there is an absence of direct evidence of discrimination also apply to analysis of her retaliation claim. *See, e.g.*, *Taylor v. Solis*, 571 F.3d 1313, 1320 n.* (D.C. Cir. 2009); *see also McGrath*, 666 F.3d at 1383-84 (applying *Brady* to a retaliation claim). In this case, as noted, the defendant has asserted the plaintiff's AWOL status, and failure to return to work, as the legitimate, non-retaliatory reason for her termination. *See* Def.'s Mem. at 15. Therefore, "the district court must resolve one central question," namely "[h]as the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason and that the employer intentionally [retaliated] against the employee on the basis of [sex]?" *Brady*, 520 F.3d at 494; *McGrath*, 666 F.3d at 1383.

The plaintiff has not carried her burden, and cannot show that the third element of a retaliation claim, "that the employer took a materially adverse action against the employee 'because' the employee opposed a protected practice." *McGrath*, 666 F.3d at 1383. The plaintiff discusses her purported protected activity, including her advocacy related to the agency's pay program and attempts to make the agency more family-friendly, at length, but produces zero evidence to suggest that her termination was tied to these activities, nor her earlier EEO/EEOC activity.[9]

---

[9] The defendant argues for the first time in the Reply that the plaintiff is incorrect in claiming that (1) her authoring of The Heart of the Matter, or (2) her informal requests for a leave of absence because of health issues, constitute protected activity or opposition to an unlawful employment practice. *See* Def.'s Reply at 16. "Title VII bars federal agencies from retaliating against an employee because [s]he has opposed 'a practice made an unlawful

The plaintiff suggests that the "disputed fact" here is "whether Defendant actually had a choice but elected to sit on its hands and refuse to help Ms. Staropoli because it intended to retaliate against her." Pl.'s Opp'n at 42. Whether the defendant could have "help[ed]" the plaintiff is not a disputed fact that merits the plaintiff's retaliation claim proceeding to a jury, however. Instead, the record is clear that the plaintiff was terminated on the basis of her refusal to return to work after she was informed that she would be removed if she failed to return. *See, e.g.*, Letter of Decision Regarding Adverse Action (Removal) from K.W. Newman, Deputy Chief Inspector, to the Plaintiff (Nov. 27, 2001), ECF No. 33-12, at 4 (informing the plaintiff of the "decision that the charge of [AWOL] contained in the Notice of Proposed Removal[ ] is sustained and warrants your removal from the Postal Service," effective December 3, 2001); Staropoli Dep. at 86:10-24. While the plaintiff hoped for discretionary "help" from her employer, she has not shown that the defendant was retaliatory in any way in terminating her employment after she disobeyed an order to return to work. "[C]ourts are without authority to second-guess an employer's personnel decision absent a demonstrably discriminatory motive, and [the plaintiff's] responses offer[] no grounds for a rational juror to conclude that the reason [she] was fired was [retaliation] rather than" failure to follow an order to return to work. *McGrath*, 666 F.3d 1384-1385 (citation and internal quotation marks omitted).

---

employment practice' by the statute." *McGrath*, 666 F.3d at 1380 (quoting 42 U.S.C. § 2000e-3(a)). "[The D.C. Circuit has] interpreted this phrase as extending to a practice that the employee reasonably and in good faith *believed* was unlawful under the statute." *Id.*; *see also George v. Leavitt*, 407 F.3d 405, 417 (D.C. Cir. 2005) ("We have held that 'an employee seeking the protection of the opposition clause [must] demonstrate a good faith, reasonable belief that the challenged practice violates Title VII.'") (alteration in original) (quoting *Parker v. Balt. & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981)).  Here, the plaintiff arguably could demonstrate a good faith, reasonable belief that the challenged practices violated Title VII; however, the Court need not determine if each instance of the plaintiff's purported "protected activity" should be considered as such since, as explained below, it is clear that the plaintiff has not produced "sufficient evidence for a reasonable jury to find that the employer's asserted non-[retaliatory] reason was not the actual reason" for her termination and that "the employer intentionally [retaliated] against the employee," *Brady*, 520 F.3d at 494.

Finally, as with the plaintiff's discrimination claim, the plaintiff has not overcome an inference that Geffen, the supervisor who proposed her removal, was not retaliating against her when he was the same supervisor who had arranged for her hire in the Washington, D.C. area; gave her more responsibility as a Polygraph Examiner, with an expanded geographic territory; granted her medical leave; and, at the plaintiff's request, wrote the plaintiff a glowing letter of recommendation months before she was removed from service and *after* she co-authored The Heart of the Matter, which she claims was protected activity.  *See Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (noting that "[i]f [the supervisor] did not want to work with [the plaintiff] because of her . . . gender, it would be odd to select her and then immediately start ginning up reasons to dismiss her.").

Accordingly, since no reasonable juror could find that the defendant retaliated against the plaintiff in terminating her employment, the Court will grant summary judgment for the defendant on the plaintiff's retaliation claim.

## IV.    CONCLUSION

For the reasons explained above, the Defendant's Motion for Summary Judgment, ECF No. 33, is GRANTED.  An Order consistent with this Opinion shall be issued.

**Date:** January 28, 2013

_____
BERYL A. HOWELL
United States District Judge